# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

SUREFIL, LLC, and
SUREFIL PROPERTIES, LLC,

      Debtor.

_____/

VIVA BEVERAGES, LLC,

      Plaintiff,

v.

SUREFIL, LLC,

      Defendant.

_____/

Case No. 09-06914
Chapter 11
Jointly Administered
Hon. Jeffrey R. Hughes

Adv. Proc. No. 10-80045

## VERIFIED COMPLAINT

Viva Beverages, LLC ("Viva"), by its counsel, Jaffe Raitt Heuer & Weiss, P.C., brings this verified complaint ("Verified Complaint") to recover: (i) its equipment from the Debtor, and (ii) damages incurred by Viva as a result of the Debtor's continuing breach its contractual obligations to Viva. In support of the Verified Complaint, Viva states as follows:

### Jurisdiction and Venue

1.    The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (K) and (O).

1853867.03

### Background

4.      Surefil, LLC (the "Debtor") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Code") on June 8, 2009 (the "Petition Date").  The Debtor's bankruptcy case is being jointly administered with the bankruptcy case of its affiliate Surefil Properties, LLC [Case No. 09-06916], which case was also commenced on the Petition Date.

5.      The Debtor is operating its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code and this Court's Definitive Order for Debtor-In-Possession [Doc. No. 10] (the "Definitive Order") dated June 9, 2009.

A.      EXECUTION OF THE MANUFACTURING AND SUPPLY AGREEMENT.

6.      Viva is a beverage company that markets and distributes beverages including, but not limited to, "Quick Energy" and "Viva," which are single-shot energy drinks distributed and sold both in the United States and internationally (collectively, the "Energy Drink").

7.      The Debtor is a contract manufacturer of liquid fill plastic bottle consumer products such as shampoo, conditioner, mouthwash, bubble bath, body wash and energy drinks.

8.      On August 21, 2008, Viva and the Debtor executed a certain Manufacturing and Supply Agreement whereby the Debtor agreed to manufacture the Energy Drink for Viva at its facility in Kentwood, Michigan (the "Supply Agreement").  *See* Supply Agreement attached hereto as Exhibit A.

9.      Pursuant to the Supply Agreement, Viva would supply the raw materials for the Energy Drink to the Debtor for manufacturing.  Viva also provided the bottles, bottle caps, labels and packaging to the Debtor.

10.     Additionally, as set forth in the Supply Agreement, Viva and the Debtor agreed on a set of quality standards for manufacturing the Energy Drink, including standards for composition, product safety assurance, manufacture and quality control of the Energy Drink and the labeling, fill amount, and bottle cap torque (collectively, the "Specifications").

11.     Because the Debtor did not have the equipment necessary to comply with the Supply Agreement, and in order to facilitate the Debtor's ability to fulfill Viva's requirements under the Supply Agreement, Viva provided the Debtor with initial funding in the amount of $115,000 (the "Initial Funding") to purchase certain production equipment on Viva's behalf to be used by the Debtor in producing the Energy Drink (the "Pre-Petition Equipment").

**B.     SUREFIL'S BANKRUPTCY AND THE BAILMENT AGREEMENT.**

12.     On the Petition Date, ten months after execution of the Supply Agreement, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

13.     The Definitive Order authorizes the Debtor to carry on its business in the ordinary course until further order of the Court.

14.     On October 3, 2009, Viva agreed to provide the Debtor with additional funding in the amount of $79,242 (the "Additional Funding") to purchase certain additional equipment (the "Post-Petition Equipment" and collectively with the Pre-Petition Equipment, the "Equipment") pursuant to a certain Bailment Agreement (the "Bailment Agreement"). *See* Bailment Agreement attached hereto as Exhibit B.

15.     The Bailment Agreement contemplated, among other things, that Viva would purchase the Post-Petition Equipment with the Additional Funding and allow the Debtor to use all of the Equipment in order to fulfill its obligations under the Supply Agreement. *Id.* at ¶ E.

16.     Pursuant to the Bailment Agreement, the Debtor acknowledged that all of the Equipment was owned solely by Viva. *Id.* at ¶ 3.

17.     The Debtor also acknowledged and agreed in the Bailment Agreement that the Energy Drink "shall at all times comply with the Specifications (as defined in the Supply Agreement)." *Id.* at ¶ 7.

18.     Finally, the Bailment Agreement contained a termination provision (the "Termination Provisions") which provides:

> TERMINATION.     This Agreement may be terminated for any reason and at anytime by mutual agreement of the parties, immediately upon the expiration or termination of the Supply Agreement, **or unilaterally by VIVA on 48 hours prior written notice. Upon termination of this Agreement for any reason or failure of Surefil to comply with the terms of the Supply Agreement, the Equipment shall be made immediately available to VIVA FOB Surefil's premises**. It is expressly understood and agreed by and between the parties that the termination of this Agreement shall not in any ways affect Surefil's acknowledgment that the Equipment is the sole property of VIVA**. A termination of this Agreement for any reason shall also automatically terminate the Supply Agreement.**

*See* Bailment Agreement, ¶ 10 (emphasis added).

19.     On October 29, 2009, the Debtor filed the Debtors' Motion for Approval of Bailment Agreement [Doc. No. 101] (the "Motion") wherein the Debtor requested that this Court enter an order authorizing the Debtor to enter into the Bailment Agreement with Viva.

20.     On November 3, 2009, The Huntington National Bank acknowledged that the Equipment "is not subject to the security interest granted to The Huntington National Bank in the equipment of Surefil, LLC." *See* Acknowledgement attached hereto as Exhibit C.

21.     On November 18, 2009, the Court entered its Order Re: Debtor's October 29, 2009 Motion – Bailment Agreement [Doc. No. 111] which modified the Definitive Order to the

extent necessary to give the Debtor the authority as a debtor in possession to enter into the Bailment Agreement.

### C. SUREFIL'S BREACH OF THE QUALITY STANDARDS AND VIVA'S TERMINATION OF THE BAILMENT AGREEMENT.

22.     In early January, 2010, Viva discovered that the Debtor had introduced foreign materials into the Energy Drink and otherwise failed to maintain quality control with respect to the Energy Drink, thereby contaminating the Energy Drink (the "Contamination").

23.     On January 22, 2010, as a result of the discovery of the Contamination, Viva served notice to the Debtor of its rejection of the contaminated product pursuant to Section 9.02 of the Supply Agreement and MCL § 440.2601 (the "Notice").   *See* Notice of Rejection of Defective Products attached hereto as Exhibit D.

24.     The Notice advised the Debtor that Viva was exercising its rights under the Termination Provision to unilaterally terminate both the Bailment Agreement and the Supply Agreement and demanded that the Debtor comply with its obligations under the Bailment Agreement to, among other things, immediately make all of Viva's Equipment "immediately available to Viva, FOB Surefil's premises." *Id.* at ¶ 2.

25.     Once the Supply Agreement was terminated, Viva had no obligation to provide the Debtor with an opportunity to cure its breach under the Supply Agreement. Nevertheless, the Debtor has failed to cure such breach in a timely manner.

26.     On January 29, 2010, Viva sent a representative to the Debtor's premises to, among other things, inspect and remove the Equipment.  The Debtor refused to allow Viva to inspect or remove any of the Equipment.

27.     Thereafter, on February 1, 2010, Viva, through its counsel, renewed its request to the Debtor to allow it to inspect and remove the Equipment.  In addition, Viva requested that the

Debtor confirm that it was not using the Equipment, as required under the Bailment Agreement. The Debtor failed to respond to Viva's request.

28.     Viva is justifiably concerned with the Debtor's continued failure to comply with its obligations under the Supply Agreement and the Bailment Agreement.

### Count I – Claim and Delivery

29.     Viva repeats and realleges the allegations contained in paragraphs 1 through 28 of its Verified Complaint as if fully set forth herein.

30.     The Equipment is property of Viva.

31.     Viva is entitled to repossession of its Equipment under the Bailment Agreement.

32.     Viva has demanded that the Debtor make the Equipment immediately available at the Debtor's premises for removal by Viva, which the Debtor has refused or otherwise failed to do.

33.     The Debtor's failure to voluntarily surrender the Equipment constitutes an unlawful retention of the Equipment and a continuing breach of its obligations under the Bailment Agreement.

34.     Given the Debtor's considerable resistance and obstruction with respect to Viva's attempts to obtain the Equipment in accordance with the Bailment Agreement, Viva is justifiably apprehensive that the Equipment will not be timely returned to Viva and, moreover, may be damaged.

### Count II – Breach of Contract

35.     Viva repeats and realleges the allegations contained in paragraphs 1 through 34 of its Verified Complaint as if fully set forth herein.

36.     The Supply Agreement and the Bailment Agreement constituted valid contracts between Viva and the Debtor.

37.     The Debtor breached the contracts post-petition by, among other things, failing to manufacture the Energy Drink in accordance with the Specifications and, thereafter, failing to make the Equipment immediately available at the Debtor's premises for removal by Viva.

38.     As a result of the Debtor's continuing breach, Viva has incurred and will continue to incur damages for which it is entitled to be compensated by the Debtor as an administrative expense.

39.     The Debtor's post-petition damages will likely adversely affect the recovery by the Debtor's unsecured creditors in these cases, if any, but may be mitigated by the Debtor immediately surrendering the Equipment to Viva.

WHEREFORE, Viva requests that this Court:

A.    Enter judgment in favor of Viva and against the Debtor, determining that Viva is entitled to possession of the Equipment;

B.    Order the Debtor to permit Viva or its designated representative immediate access to inspect and remove the Equipment;

C.    Order the Debtor to compensate Viva for damages it has occurred as a result of the Debtor's continuing breach of the Supply Agreement and the Bailment Agreement; and

D.    Award such other relief as the Court deems just and equitable.

Respectfully submitted by,

JAFFE RAITT HEUER & WEISS, P.C.

By: _____
Judith Greenstone Miller (P29208)
Michael S. Khoury (P34413)
Paul R. Hage (P70460)
Attorneys for Viva Beverages, LLC
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
Facsimile: (248) 351-3082
jmiller@jaffelaw.com
mkoury@jaffelaw.com
phage@jaffelaw.com

Dated: February 2, 2010

1853867.03

## VERIFICATION

I, Daniel Lutz, declare that the facts contained in this Verified Complaint are true to the best of my information, knowledge and belief.  If called, I am competent to testify to the matters contained in the Verified Complaint.

**VIVA BEVERAGES, LLC**

By: _____
     Daniel Lutz

Its:  Vice President of Operations  _____

Subscribed and sworn to before me
this 2 day of February, 2010.

_____
Notary Public
Oakland County, Michigan
My Commission Expires: 8-23-2012

ROXANNE L. PRICE
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Aug 23, 2012
ACTING IN COUNTY OF Oakland

1853867.03

# EXHIBIT A

# Manufacturing and Supply Agreement

This agreement is made between Surefil LLC, a Michigan Limited Liability Company located at 4560 Danvers Drive in Kentwood, Michigan, USA 49512 ("Surefil" or "Manufacturer") and Viva Beverages LLC located at 27777 Franklin Road, Suite 2500, Southfield, Michigan 48034 ("Viva" or "Buyer") as of August 21, 2008 (the "Effective Date").

Whereas Surefil is a manufacturing company and Viva, desires to have Surefil manufacture products under Buyer's label and Surefil is capable and desires to manufacture the products the two companies enter into this binding legal agreement for the manufacture and supply of products, Buyer and Manufacturer each may be referred to as a "Party" or collectively as the "Parties".

WHEREAS, Manufacturer desires to manufacture such Products for Buyer pursuant to the terms of this Agreement, including, but not limited to, payment of the Price (as hereinafter defined).

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereto agree as follows:

## AGREEMENT

## ARTICLE 1. DEFINITIONS

As used throughout this Agreement, each of the following terms shall have the respective meaning set forth below:

1.01 "cGMPs" mean the current Good Manufacturing Practices stipulated or promulgated from time to time by Regulatory Authorities (as hereinafter defined) that are applicable to the manufacturing, production and supply of Product.

1.02 "Contract Year" means the period beginning at 12:00 a.m. on the same day and month as the Effective Date of a given year and ending at 12:00 a.m. on the next succeeding anniversary of the Effective Date during the Term of this Agreement.

1.03 "Intellectual Property Rights" mean the intellectual property, trade secrets, formulas, recipes, know-how, technology and information owned, licensed or sublicensed by Buyer (whether or not protected by patents), including any improvements to the Product, that are required in order to make any Product.

1.04 "Price" means the sum of the Conversion Price described in Schedule A plus the appropriate Raw Materials Price, if any, plus the Administration Fee of (5%) for the purchase of raw materials, if applicable.

Blue Book, Manufacturer's responsibility will be limited to providing a credit to Buyer for the Conversion Price for the nonconforming Products. If Manufacturer has not complied with cGMPs and Manufacturer's internal quality control standards or the nonconforming Products fall outside of the scrap parameters contained in the Blue Book, Manufacturer shall correct the problems, at its costs, and deliver Product meeting the quality standards as soon as practicable, but no later than two weeks after notice from Buyer. Manufacturer will provide reasonable access to Buyer to inspect the production process when runs of the Product are scheduled by Manufacturer and Buyer. Manufacturer may be required to limit access if required by its agreements with other customers, but will use commercially reasonable efforts to provide requested access.

## ARTICLE 3 – PRICES FOR PRODUCTS

3.01    Price. Throughout the Term of the Agreement, Manufacturer shall invoice and Buyer shall pay the Price for each Product ordered and shipped to Buyer in accordance with the terms herein, as identified in Schedule A.

3.02    Conversion Price.

(a)    The    Price    which Manufacturer shall charge Buyer for the actual manufacturing, packaging and supplying of each Product delivered to Buyer in accordance with the terms herein during the Term of this Agreement, other than the Raw Materials Price,

and the Administrative Fee shall be the Conversion Price.

(b)    For purposes of clarification and the avoidance of doubt, the Conversion Price includes all charges, costs and expenses that Manufacturer may incur (both internally and externally) in connection with manufacturing, packaging and supplying Buyer with the fully-finished Product that conforms to the Specifications (other than the Raw Materials Price and the Administrative Fee, if applicable). Costs that are not included (primarily consisting of costs for perishable change parts) are items like pallets, and other special requests.

3.03    Cumulative Annual Allowable Raw Materials Waste. Buyer understands and acknowledges that there is waste ("Waste") inherent in any manufacturing process. Manufacturer will use commercially reasonable efforts to reduce the waste as much as practical. Manufacturer will work together with Buyer to reduce Waste and produce the Products in the most economical way. The Buyer understands and acknowledges that the Manufacturer cannot control the incoming materials quality.

3.04    The    Conversion    Price Adjustments. Except as permitted in accordance with this Section 3.06, the Conversion Price shall not be adjusted throughout the Term of the Agreement:

(a)    At the beginning of the first quarter of the calendar year of this Agreement Manufacturer may increase the Conversion

4.01   Binding and Estimated Forecasts. Each week during the term of this agreement, Buyer shall submit to Manufacturer through email a four week forecast of which the first two weeks will be considered binding and the later two weeks will be considered tentative and subject to modifications. Manufacturer and Buyer must mutually confirm acceptance of binding requirements and delivery dates before the end of each week; at such time these requirements become firm and represent the order. The acceptance of the firm order by Manufacturer represents a warranty to Buyer that it has the capability of producing the Products in accordance with the delivery schedule and the specifications for the Products. In addition, when consistency is established, Buyer will provide Manufacturer, through e-mail, a minimum of thirteen weeks of estimated forecasts for planning purposes.

4.02   Reimbursement for Unused Raw Materials. To the extent Manufacturer has purchased Raw Materials for the Products (only if specifically requested by Buyer), prior to Manufacturer recurring payment for such Raw Materials, Buyer informs Manufacturer in writing that it no longer desires to have Manufacturer use such Raw Materials in any Products, Manufacturer shall use its good faith efforts to return such Raw Materials to the supplier of such Raw Materials ("Supplier") and receive a credit for such purchase. If a restocking or similar fee is required, then Buyer

agrees to pay such fees. If the Supplier refuses to accept such Raw Materials and provide Manufacturer with a credit, then Manufacturer shall send Buyer an invoice for the costs of the Raw Materials and reasonable disposal costs. Buyer shall pay such invoice within 15 days. Upon receipt of payment, Manufacturer shall either ship or destroy such Raw Materials, as directed by Buyer in writing.

4.03   Planned Work Stoppages. Manufacturer will provide Buyer with its holiday schedule for each calendar year. This will be provided in January of each calendar year.

4.04   Conflicts. The terms and conditions in this Agreement represent the entirety of the arrangements between Manufacturer and Buyer, and supersede any terms contained in any purchase order, purchase order, release, confirmation, acceptance or any similar document, which terms will not be applicable.

ARTICLE 5 - ADDITIONAL UNDER-STANDINGS OF THE PARTIES

5.01   Changes to Specifications. The Parties acknowledge and agree that Buyer may need to make changes to the Specifications throughout the Term of the Agreement. Buyer shall make such changes to the Specifications by communicating the proposed changes to Manufacturer in writing. The Manufacturer must not unreasonably reject changes and will

continue for a period of two (2) years, unless sooner terminated as expressly provided under the terms of this Agreement. Buyer will notify Manufacturer in writing not less than One Hundred Eighty (180) days before the end of the Initial Term or any Additional Term if the Buyer does not intend on extending the Agreement for an Additional Term.

6.02    Additional Term.    This Agreement will be extended for an additional year, for a total remaining term of three years (each an "Additional Term") after the expiration of each year, unless the parties agree otherwise in writing at least One Hundred Eighty (180) days prior end of a given term. This will have the effect of being a three-year "evergreen" contract unless otherwise cancelled by either party under the terms of this agreement.

## ARTICLE 7 - TERMINATION

7.01    Breach.    If either Party ("Breaching Party") shall materially breach or materially fail in the observance or performance of any representation, warranty, guarantee, covenant or obligation under this Agreement, the other Party ("Nonbreaching Party") may provide the Breaching Party written notice that it intends to terminate this Agreement and the grounds for terminating this Agreement. Manufacturer shall not be deemed in material breach of this Agreement to the extent such breach was caused by the action or inaction of Buyer's Suppliers, Buyer's Materials Carriers or other vendors or contractors that Buyer directed Manufacturer to

use. The Breaching Party shall have thirty (30) days from the date it receives written notice of the Nonbreaching Party's intent to terminate this Agreement to cure the breach or failure, except to the extent that Manufacturer is not in conformance with the quality standards set forth in Section 2.03. In which case Manufacturer shall be required to establish to Buyer's satisfaction within two business days after notice from Buyer (or as soon as possible, using Manufacturer's best efforts, if the process of investigation and testing cannot be reasonably completed with the two business days) that it is able to cure the breach and to supply conforming Products within the time specified in Section 2.03. In the event such breach or failure is cured, the notice shall be of no effect and the Agreement shall continue in full force and effect. In the event such breach or failure is not cured within such thirty (30) day period the Agreement shall terminate at the end of such thirty (30) day period. If the Buyer under goes a Change in Control, and the new Buyer elects not to continue the contract, the Buyer must immediately pay all outstanding invoices, cover costs of raw materials as outlined previously and otherwise settle all outstanding accounts immediately. If the Manufacturer undergoes a Change in Control and the successor does not agree to the terms of this Agreement or does not provide Buyer with adequate assurance of future performance, Buyer may terminate this Agreement and designate which prior orders Manufacturer must complete under the terms of

above, the Nonbreaching Party may pursue any remedy available in law or in equity with respect to such breach.

(b)    If the Agreement expires or if Buyer (or its successor) terminates this Agreement, then within sixty (60) calendar days after such expiration or termination, Manufacturer shall provide Buyer with a written report ("Inventory Report") of the total quantity of all Raw Materials and finished Products in Manufacturer's Facility and the total quantity of Raw Materials that Manufacturer has ordered pursuant to a Firm Order but has not yet received and the manufacture of which the Manufacturer cannot reasonably terminate. Buyer shall purchase all such finished Products at the applicable Price and Buyer shall also purchase Raw Materials specified in the Inventory Report from Manufacturer at the cost of the Raw Materials paid by Manufacturer plus all shipping and shipping insurance costs related to the Raw Materials; provided such Raw Materials, Manufacturer shall ship or destroy such Products or Raw Materials in accordance with Buyer's Instructions at Buyer's expense.

## ARTICLE 8 - DELIVERY

8.01    Shipment. Manufacturer will pack all Product ordered hereunder in accordance with the Specifications.

8.02    Risk of Loss. The risk of loss with respect to Product shall remain with Manufacturer until such time that the Product leaves the Facility on Buyer's or on any other carrier, at which time, the risk of loss for the Product shall transfer to Buyer. Title to Product designated for sale shall transfer to Buyer at Manufacturer's dock. Buyer assumes responsibility for the Product (regardless of when title passes) after the Product is released from Manufacturer's dock for all damages to the Product, including, but not limited to, damages or defects to the Product caused by the shipping. Buyer shall assume claims responsibility while the Product is in transit from the Facility to unloading at the Buyer's facility or such other location as designated by Buyer as the point of delivery.

## ARTICLE 9 - QUALITY/DEFECTIVE PRODUCT/INSPECTIONS/TESTING

9.01    Quality. Manufacturer warrants that any Product sold to Buyer hereunder shall comply, to the best of the Manufacturers ability, with the Specifications. Delivery of any Product by Manufacturer to Buyer shall constitute a certification by Manufacturer that the Product conforms to the Specifications. Manufacturing and testing shall be performed as per applicable Federal cGMPs Regulations & Guidelines.

9.02    Defective Products. In the regular course of business, Buyer may reject or refuse acceptance of products from Manufacturer which are not strictly in conformance with the Specifications and requirements in this Agreement.

obligations as soon as practicable. If Manufacturer has a Force Majeure Event that remains unresolved after ninety (90) days, then Buyer may choose, but shall not be obligated, to terminate the Agreement with such termination to be effective ten (10) days following Manufacturer's receipt of Buyer's written notice of termination, without payment of any penalty except that Buyer shall pay for all Raw Materials and finished Products in accordance with Section 7.05(b) less any insurance proceeds Manufacturer receives for lost materials and products.

10.02  Failure to Supply. In the event that any of the following occur: (a) Manufacturer notifies Buyer that Manufacturer will not be able to fulfill Buyer's Firm Order in accordance with and subject to the limitations set forth in Section 4.02 (b) Buyer has sent Manufacturer a notice of termination in accordance with Section 7.02 (regardless of whether or not Manufacturer is attempting to correct such breach within Manufacturer's thirty (30) day cure period); or (c) Manufacturer is otherwise unable or unwilling to supply Product that complies with the requirements herein in such quantities as Buyer shall request and in compliance with the delivery periods set forth in the Firm Order (whether due to the occurrence of a Force Majeure Event, following the commencement of a case described in Section 7.03 by or against Manufacturer -- each of (a) through (c) are referred to as a "Failure to Supply"), then, only to the extent necessary to

satisfy such Product Variance resulting from the Failure to Supply (i) immediately following such Failure to Supply Buyer may, in addition to any other rights and remedies hereunder, purchase Product from an Alternate Supplier or manufacture such Product for itself and sell such Product in the Territory (with no obligation or liability to Manufacturer); (ii) Manufacturer shall, subject to the limitations set forth in Section 5.05, provide Buyer and such Alternate Suppliers with assistance, as reasonably requested, in connection with such Alternate Supplier's or Buyer's efforts to satisfy the Product Variance (iii) Buyer shall have no obligation to purchase Products from Manufacturer for distribution or sale or otherwise until any contractual obligations that Buyer entered into with the Alternate Supplier are satisfied, or, if Buyer opts to manufacture Product internally, until Buyer can reasonably resume purchasing Product from Manufacturer without any additional cost to Buyer; (iv) Buyer shall have no obligation to affirmatively terminate any such contractual arrangements with the Alternate Provider or, if Buyer opted to manufacture Product internally, cease manufacturing internally prior to the time that Buyer could revert to Manufacturer without incurring any cost. Notwithstanding anything to the contrary contained in this Agreement, Manufacturer shall have no obligation under this Agreement to disclose any confidential or otherwise proprietary information of Manufacturer to the Buyer or to any other party,

appear on or are otherwise used in connection with the sale and use of the Product, except to the extent that any such intellectual property is created, conceived or developed by Manufacturer, whether alone or jointly with another independent party (not the Buyer) with prior written consent of the Buyer. Any inventions, improvements or ideas relating to the subject matter of this Agreement, which are conceived and/or reduced to practice by the Manufacturer, whether alone or jointly with another independent party (not the Buyer), in connection with or during its performance under this Agreement, excluding Buyer intellectual property, shall remain the sole and exclusive property of the Manufacturer.

12.03 Intellectual Property Infringement. Buyer shall defend Manufacturer against all claims and proceedings based upon any actual or alleged misappropriation or wrongful use of any proprietary or confidential information involving the Product and shall hold Manufacturer harmless from any and all resulting losses, liabilities, damages, costs and expenses arising from such claims and proceedings. Buyer's obligations under this Article 12 specifically include, but are not limited to, any and all processes, intellectual property and designs used to manufacture the Product that are specified by Buyer. Manufacturer shall defend Buyer against any claims and proceedings based on any actual or alleged misappropriation or wrongful use of any proprietary or confidential information involving

its processes, intellectual property or other Manufacturer proprietary information involving the manufacture of the Product and shall hold Buyer harmless from any and all resulting losses, liabilities, damages, costs and expenses arising from such claims and proceedings.

ARTICLE 13 – CONFIDENTIALITY

13.01 Confidential Information. During the term of this Agreement, each party (the "Recipient") may receive or have access to certain information of the other party (the "Discloser") that is Confidential Information of the Discloser. For purposes of this Agreement, "Confidential Information" shall mean any information disclosed by the Discloser to the Recipient, whether product-related or business-related, irrespective of the form of communication that is considered competitive, confidential or proprietary in nature. All written information must be marked using words such as "confidential" or "proprietary" in order to be treated as Confidential Information. In order for oral information to be treated as Confidential Information, it must be identified as confidential within 20 days after disclosure of such information. The Recipient will protect the Confidential Information with the same degree of care as the Recipient uses for its own similar information, but no less than a reasonable degree of care. Confidential Information may only be used by those employees of the Recipient who have a need to know such information for the purposes related to this Agreement, and the

(a)    Any    breach    of    any representation or warranty made by or on behalf of Buyer in this Agreement, any certificate, or other document delivered pursuant hereto or in connection herewith;

(b)    The breach or default in the performance by Buyer of any of its agreements or obligations to be performed hereunder; or

(c)    Any claim by any person that Manufacturer is liable for any Damages or other obligation arising from the acts or omissions of Buyer.

14.02    Indemnification    by    Manufacturer.    Manufacturer agrees to indemnify Buyer and its shareholders, directors, officers, trustees, and beneficiaries against and to hold them harmless from all third party Damages arising from or resulting by reason of any of the following, unless such attorney fees and costs are determined in court to be the responsibility of the Buyer:

(a)    Any    breach    of    any representation or warranty made by or on behalf of Manufacturer in this Agreement, any certificate, or other document delivered pursuant hereto or in connection herewith;

(b)    The breach or default in the performance by Manufacturer of any of its agreements or obligations to be performed hereunder; or

(c)    Any claim by any person that Buyer is liable for any obligation arising from the acts and omissions of Manufacturer subsequent to the Effective Date of this Agreement.

ARTICLE 15 - MISCELLANEOUS PROVISIONS

15.01    Notices. All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed given (a) when personally delivered or sent by facsimile transmission to the party to be given the notice or other communication or (b) on the business day following the day such notice or other communication is sent by overnight courier to the following:

If to Manufacturer:

William Hunt
Chief Executive Officer
4560 Danvers Dr SE
Grand Rapids, MI 49512

with a copy to:

Robert Pero
Executive Vice President
4560 Danvers Dr SE
Grand Rapids, MI 49512

If to Buyer:

Viva Beverages LLC
27777 Franklin Rd., Suite 1640
Southfield, MI 48034
Attention: Manager

between the parties and shall not be construed against any party as the drafter of the Agreement.

15.10  Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signature on each counterpart were on the same instrument.

The Parties have executed this Agreement on the date set forth in the first paragraph of this Agreement.

MANUFACTURER:

SUREFIL, LLC,
a Michigan limited liability company

_____
William B. Hunt, Chief Executive Officer

BUYER:

VIVA ENERGY LLC,
a Michigan limited liability company

_____
Gary A. Shiffman, Its Manager

SCHEDULE D:  TESTING

Regular and customary testing included in conversion costs.

No additional testing required or requested.

# EXHIBIT B

## BAILMENT AGREEMENT

This Agreement entered into effective the 3rd day of October, 2009, by and between SUREFIL, LLC, a Michigan limited liability company ("Surefil") located at 4560 Danvers Drive, SE, Kentwood, MI 49512, and VIVA BEVERAGES LLC, a Michigan limited liability company ("VIVA").

### RECITALS:

A.     By agreement dated August 21, 2008, Surefil and VIVA entered into a Manufacturing and Supply Agreement (the "Supply Agreement"), whereby Surefil agreed to produce and bottle a product developed by VIVA commonly known as 2 oz. Quick Energy & VIVA (the "Product").

B.     In order to facilitate Surefil's ability to fulfill VIVA's requirements under the Supply Agreement, VIVA previously provided Surefil with funding to purchase certain production equipment on VIVA's behalf and for Surefil's use in producing the Product (the "Production Line").

C.     As of the date of this Agreement, VIVA has provided Surefil with funding in the amount of $115, 00.00 to purchase that certain equipment more particularly described on Exhibit 1 (the "Prepetition Equipment") attached hereto. Surefil acknowledges that the Prepetition Equipment is owned solely by VIVA.

D.     On June 8, 2009, Surefil filed a voluntary petition under Chapter 11 of the Bankruptcy Code and is currently acting as Debtor in Possession and continuing to operate its business.

E.     VIVA will use commercially reasonable efforts to purchase certain additional equipment more particularly described on Exhibit 2 (the "Postpetition Equipment") attached hereto, as the same may be amended from time to time, within three (3) weeks of the execution of this Agreement, and will allow Surefil

to use such Postpetition Equipment to complete the Production Line, Surefil acknowledges that any such Postpetition Equipment which VIVA elects to purchase and allow Surefil to use is owned solely by VIVA. The Prepetition Equipment and the Postpetition Equipment are collectively referred to in this Agreement as the "Equipment".

F.    VIVA has agreed to bail the Equipment with Surefil pursuant to the terms and conditions stated in this Agreement.

IT IS AGREED AND ACKNOWLEDGED BY AND BETWEEN THE PARTIES AS FOLLOWS:

1.    ACQUISITION OF EQUIPMENT.   Promptly upon the execution of this Agreement, including the Acknowledgment attached as Exhibit 3, and such approvals as the parties deem warranted, VIVA will cause a sleever (the Nestle Axon Sleever) to be delivered to Surefil and shall purchase and deliver to Surefil additional equipment necessary to complete the Production Line having a value of $79,242.

2.    RIGHT TO USE.   Surefil shall have the right to use the Equipment for the purpose of fulfilling the requirements under the Supply Agreement. Surefil shall have the right to also use the Equipment for other (non VIVA) production, provided (i) such production does not affect Surefil's production and delivery commitments to VIVA (i.e. VIVA production shall have priority), and (ii) Surefil advises VIVA of the product to be produced on the Production Line and VIVA consents to such production (which consent will not be unreasonably withheld).

3.    TITLE.   All rights, title and interest in and to the Equipment is currently and shall, at all times, remain in VIVA, and as such the Equipment shall at all times bear a stamp or other identifying mark providing that it is the sole property of VIVA. This transaction does not represent a sale of Equipment to Surefil, but rather is a bailment. The Equipment shall not be transferred or delivered to any person other than Surefil without the prior written consent of VIVA and shall be used by Surefil for the sole purpose of fulfilling the requirements under the Supply Agreement.

c:\documents and settings\rzikela\application data\hummingbird\dm\temp\1161-1180329-v1-surefil_bailment_agreement.doc

4.  REPAIR AND MAINTENANCE. Surefil agrees to use the Equipment in a careful and proper manner, to comply with all applicable laws and regulations and to maintain the Equipment in good repair and condition, at Surefil's sole cost and expense, while the Equipment is in its possession. Surefil hereby assumes all risk of loss and damage to the Equipment from any cause whatsoever and agrees that the Equipment will be returned to VIVA in the same condition as when received, ordinary wear and tear excepted.

5.  LOCATION AND INSPECTION OF EQUIPMENT AND PRODUCT.    Surefil shall segregate the environment for the Production Line. Surefil agrees not to remove the Equipment from Surefil's premises without VIVA's prior written consent. VIVA will have access to the Production Line as provided in the Supply Contract. VIVA will have access to warehouse locations containing VIVA-supplied raw materials and to finished Product. Surefil will store, at its facility, raw materials and finished Product to the extent it has space available. Surefil will not be required to pay for outside storage of raw materials or Product.

6.  INSURANCE. Surefil shall procure and maintain, at its sole cost and expense, insurance covering damage or loss to the Equipment at all times when the Equipment is in its possession, in an amount reasonably determined to be the replacement value of the Equipment with VIVA named as loss payee. Proof of such insurance shall be provided to VIVA immediately upon request. Surefil shall only use the Equipment to produce the Product for VIVA and for no other purpose without VIVA's prior written consent. Surefil further agrees to make no alterations to the Equipment without VIVA's prior written consent. All additions and improvements to the Equipment of any kind shall immediately become the property of VIVA.

7.  PERFORMANCE BY SUREFIL. Surefil acknowledges and agrees that the Product shall all at times comply with the Specifications (as defined in the Supply Agreement). Surefil will provide the following communications to VIVA: Goods in receiving; shipping; inventory; tracking; daily production reporting; and quality reporting. Such communications shall be at such time and in such detail and in such submission formats as VIVA may reasonably require.

8.    NOTICE OF PRODUCTION RUNS; PACKAGING.  VIVA will provide Surefil with at least two weeks advance written notice of the desired commencement date of a production run.  Any changes VIVA may request in packaging requirements will be billed at Surefil's cost plus 10%.

Additionally, Viva will be allowed to make one run of 500,000 to 1,000,000 units in October to fill short term needs.  Viva will disclose to Surefil the filler used.   This will be an amendment to the current exclusive manufacturing contract.

9.    LIMITATION ON SETOFF RIGHTS.  VIVA shall not be entitled, through setoff, recoupment or otherwise, to back charge or deduct from Surefil invoices for the Product for any reason related to the Equipment (subject to the exceptions below); provided, however, that VIVA shall retain the right to back charge or deduct from such invoices for reasons relating to shortages and non-conforming goods.  VIVA and Surefil acknowledge that The Huntington National Bank ("HNB") has a security interest in Surefil's assets and accounts and that HNB is a third party beneficiary of this Agreement with respect to the provisions of this paragraph 9 if, and only if, HNB acknowledges in the form attached hereto as Exhibit 3, or such other form as is reasonably acceptable to VIVA and HNB, that neither the Prepetition Equipment nor the Postpetition Equipment is subject to the security interest granted to HNB by Surefil in the assets and accounts of Surefil.

10.    TERMINATION.  This Agreement may be terminated for any reason and at anytime by mutual agreement of the parties, immediately upon the expiration or termination of the Supply Agreement, or unilaterally by VIVA on 48 hours prior written notice.  Upon termination of this Agreement for any reason or failure of Surefil to comply with the terms of the Supply Agreement, the Equipment shall be made immediately available to VIVA FOB Surefil's premises.  It is expressly understood and agreed by and between the parties that the termination of this Agreement shall not in any way affect Surefil's acknowledgment that the Equipment is the sole property of VIVA.    A termination of this Agreement for any reason, shall also automatically terminate the Supply Agreement.

11.   NOTICES.  All notices required pursuant to this Agreement shall be sent by certified mall, return receipt requested or by facsimile with confirmation of transmission as follows:

SUREFIL                                         Surefil, LLC
                                                Attention:  William Hunt
                                                4560 Danvers Drive, S.E.
                                                Grand Rapids, MI  49512
                                                Facsimile:  (616) 532-3463

WITH A COPY TO:                                 Harold E. Nelson
                                                NANTZ, LITOWICH, SMITH, GIRARD & HAMILTON
                                                2025 E. Beltline, S.E., Suite 600
                                                Grand Rapids, MI  49546
                                                Facsimile:  (616) 977-0529

VIVA:                                           VIVA Beverages, LLC
                                                Attention:  Manager
                                                27777 Franklin Road
                                                Suite 1640
                                                Southfield, MI 48034

WITH A COPY TO:                                 Michael S. Khoury
                                                JAFFEE RAITT HEUER & WEISS, P.C.
                                                27777 Franklin Road, Suite 2500
                                                Southfield, MI  48034
                                                Facsimile:  (248) 351-3082

12.   MERGER AND INTEGRATION.  This Agreement, together with the Supply Agreement, constitute the entire agreement of the parties with respect to the subject matter hereof and merges herein all other agreements, negotiations and representations.  This Agreement may only be amended or modified by a writing executed by both parties. In the event of a conflict between the terms of

this Agreement and the terms of the Supply Agreement, the terms of this Agreement shall govern.

13.    COUNTERPARTS. This Agreement may be executed by counterparts, all of which shall constitute a single Agreement. This Agreement may be executed by facsimile signatures or e-mail signatures, all of which shall be deemed to be original signatures and constitute the valid and enforceable undertaking of the party so signing.

14.    GOVERNING LAW. This Agreement shall be governed by the laws of the State of Michigan without regard to its conflict of law principles.

SUREFIL, LLC

W.B. HUNT CORPORATION
ITS MANAGER

By: _____

W.B. Hunt, President

VIVA BEVERAGES, LLC

By: _____

Its: _____

Exhibit 1
Line 4 Project Budget

05/12/09

| Item | Date | Amount | Item | Source | Paid |
|------|------|--------|------|--------|------|
| A | 03/03/09 | $21,605.00 | Epak Filler Capper | SFPC#02996 E-Pak Invoice # 22223 Glenn Jones 1(800) 226-0466 | $60,802.50 |
| | | Balance due $60,802.50 | | | |
| C | 02/10/09 | $2,200.00 | NEDCO Bottle Transporter | Bid-On-Equipment Invoice # 3367 | $2,885.00 |
| | | $220.00 | DC Motor Controller Installe | Invoice # 3357 | |
| | | $485.00 | | Lauren Wilton | |
| | | $2,885.00 | | 847-854-8577 | |
| D | 02/12/09 | $15,800.00 | New England Unscrambler | Bid-On-Equipment Invoice # 3368 | $17,365.00 |
| | | $1,330.00 | | Lauren Wilton | |
| | | $235.00 | | 847-854-8577 | |
| | | $17,365.00 | | | |
| E | 02/17/09 | $4,500.00 | Accumulation Table | Bid-On-Equipment Invoice # 3384-5 | $4,950.00 |
| | | $450.00 | Arrowhead Bi-flow 42X138 | Invoice # 3384-7 | |
| | | $4,950.00 | Lauren Wilton | 847-854-8577 | |
| F | 03/12/09 | $2,500.00 | Accumulation Table | Bid-On-Equipment Invoice # 3493 | $3,400.00 |
| | | $250.00 | Stainless Steel Conveyor | Invoice # 3493 | |
| | | $650.00 | 16X4/2 | Lauren Wilton | |
| | | $3,400.00 | | 847-854-8577 | |
| G | | $8,063.14 | Case Taper | Lauren Wilton | $8,063.14 |
| | | $18,060.00 | 5000 gal tank | 847-854-8577 | $18,060.00 |
| TOTAL | | | | TOTAL Paid | $115,525.64 |

C:\Documents and Settings\Daniel M Lutz\Local Settings\Temporary Internet Files\Content.Outlook\ITEZ\CSR10152\164 1 Prepetition (3)

10/13/2009













Exhibit 2

### Work necessary to complete line Four

| Item # | Vendor | Item Description | $ | | Viva Purchased |
|---|---|---|---|---|---|
| 1 | Carry Over | Not Paid Pre Petition | | 525 $ | 525 |
| 2 | Nestle | Axon Dual Head Sleever | | | |
| | | Dual Head sleever | $ 25,000 | | |
| | | Crating | 500 | | |
| | | Freight | 700 | | |
| | | | | $ 26,200 | Paid |
| 3 | Axon | Custom Parts for Axon Sleever | | | |
| | | 2 Print registration | $ 2,500 | | Paid |
| | | 2 T-port | 2,400 | | Paid |
| | | 2 Print reg tooling plate | 1,050 | | Paid |
| | | Photo eye | 160 | | Paid |
| | | Bumper wheel | 1,500 | | |
| | | Spare parts | 1,350 | | |
| | | Bullets | 1,200 | | |
| | | Anti static | 2,140 | | |
| | | | | $ 12,300 | |
| 4 | E-Pak | Custom 24 Head Filler for 2 oz Energy Drinks | | | |
| | | Capper/Filler/Conveyor | $ 60,803 | | |
| | | Freight | 500 | | |
| | | | | $ 61,303 | |
| 5 | Godwin | Air Lines and Regulators | | | |
| | | Pressurized air for equipment | $ 6,104 | | |
| | | | | $ 6,104 | |
| 6 | Spring Electric | Electrical Wire and Components | $ 2,440 | | |
| | | Electrical | $ 1,900 | | |
| | | Power Flex 700 | $ 700 | | |
| | | | | $ 5,040 | |
| | | Total | | $ 111,581 | |
| | | Amounts Paid | | $ 33,310 | |
| | | Remaining | | $ 78,242 | |

# EXHIBIT C

ACKNOWLEDGMENT

Pursuant to a Bailment Agreement between Surefil, LLC and VIVA Beverages, LLC, dated October 3, 2009, The Huntington National Bank, by its authorized agent, acknowledges that the property identified in Exhibits 1 and 2 attached hereto have been or will be purchased by or on behalf of VIVA Beverages, LLC ("VIVA") for the use by Surefil, LLC in the manufacturing and bottling of product for VIVA (the "Equipment"). The Huntington National Bank acknowledges that such Equipment is not subject to the security interest granted to The Huntington National Bank in the equipment of Surefil, LLC.

This Acknowledgment shall become effective at such time as the Bankruptcy Court approves the Bailment Agreement or upon waiver of that condition by Viva.

This Acknowledgment is executed for good and valuable consideration, receipt of which is hereby acknowledged.

Executed effective this 3rd day of November, 2009.

THE HUNTINGTON NATIONAL BANK.

By: _____
FREDERICK W. PULGO

Its: Vice President

CONSENT TO ACKNOWLEDGMENT;
BORROWERS:
SUREFIL, LLC
 BY: WB HUNT CORP., MANAGER

By: _____
William B. Hunt, President

SUREFIL PROPERTIES, LLC

By: _____

William B. Hunt, Manager

CONSENT TO ACKNOWLEDGMENT;

GUARANTOR:

_____

William B. Hunt

# EXHIBIT D



**BEVERAGES**    27777 Franklin Road, Suite 1640, Southfield, MI 48034

Telephone: (248) 746-7044 • Fax: (248) 746-7090 • www.quickenergy.com

January 22, 2010

William Hunt
Chief Executive Officer
Surefil, LLC
4560 Danvers Dr. SE
Grand Rapids, MI 49152

> Re:    Notice of Rejection of Product
>         Notice of Termination of Bailment Agreement and Supply Agreement
>         Notice of Cease and Desist
>         Demand for Explanation
>         Notice of Evidence Hold

Dear Mr. Hunt:

1.    **Notice of Rejection of Defective Products**

It has become apparent to Viva Beverages, LLC ("Viva") that in the production of the five batches identified below (each a "Product", and collectively the "Products"), Surefil, LLC ("Surefil") may have introduced foreign materials into the Products or failed to otherwise meet its obligations to maintain quality control, and thereby contaminated them:

| Product | Batch | Lot Code | Quantity |
|---|---|---|---|
| Israel Orange | 10 | 011210SF10A | 62,208 |
| | 11 | 011210SF11A | |
| | | 011210SF11B | 62,208 |
| | 12 | 011210SF12B | 64,368 |
| Germany Orange | 13 | 011310SF13A | |
| | | 011310SF13B | 62,208 |
| | 14 | 011310SF14B | 65,232 |

Viva has obtained the results of an external analysis of the Products and certain of the Products' raw materials (the "Analysis"), which reveals the presence of several elements inconsistent with the Products' composition specifications (the "Specifications"). The Analysis

has also confirmed that the glycerin provided by Viva for the Products (Glycerine 99.7% USP Kosher ID 1547), was not the source of the Products' contamination.

As a result of the contamination of the Products, Viva hereby serves notice to Surefil of its rejection of the Products pursuant to Section 9.02 of the Manufacturing and Supply Agreement between Viva and Surefil, dated August 21, 2008 ("Supply Agreement") and MCLA 440.2601.

2.    Notice of Termination of Bailment Agreement and Supply Agreement

Pursuant to Section 10 of the Bailment Agreement between Viva and Surefil, dated October 3, 2009 ("Bailment Agreement"), Viva hereby gives Surefil forty-eight (48) hour prior notice of its unilateral termination of the Bailment Agreement.

As required by the Bailment Agreement, Surefil must, among other thing, immediately make all of Viva's Equipment (as this term is defined in the Bailment Agreement) available to Viva, FOB Surefil's premises.  We will contact you to arrange removal of the equipment.

Termination of the Bailment Agreement also automatically terminates the Supply Agreement.

Viva expects Surefil to fulfill all its obligations in connection with the termination of the Supply Agreement, including, but not limited to, (i) providing Viva with an Inventory Report (as such term is defined in the Supply Agreement) within sixty (60) days of termination, as provided in Section 7.04(b) of the Supply Agreement and (ii) returning all Confidential Information (as this term is defined in the Supply Agreement) to Viva within fourteen (14) days of termination, as provided in Section 13.03 of the Supply Agreement.

3.    Notice of Cease and Desist

As required by the Bailment Agreement, immediately upon receipt of this notice of termination of the Bailment Agreement, Surefil must cease to use any of Viva's Equipment for non-Viva production.

Viva hereby serves Surefil notice that it immediately cease and desist from all use of Viva's Equipment for any purposes, including, but not limited to, for non-Viva Production.

4.    . Demand for Explanation

It has come to the attention of Viva that Surefil may have provided Viva's Confidential Information to a third party known as either Nano Energy and/or Smart Energy (the "Israeli Competitor") in order to allow it to compete with Viva in the Israeli market.

Viva hereby demands that Surefil immediately produce any and all communications, in any form or media, including, but not limited to, all paper documents and electronic data stored on desktop and laptop computers, e-mails, servers, external hard drives, application files, storage

2

and backup tapes/devices, disk backups (floppy discs, CD's, zip disks, flash drives, optical disks), other storage media devices like PDA's, I-Pod's, Blackberries, USB drives, cameras and cell phones and voice mail systems and answering machines, between itself and the Israeli Competitor (including officers, employees and agents), including, but not limited to, the production of any Confidential Information provided to the Israeli Competitor or to any other party.

5.    **Notice of Evidence Hold**

The contamination of the Products, the potential provision by Surefil of Viva Confidential Information to the Israeli Competitor and other disputes between Viva and Surefil may result in a contested proceeding. Viva hereby formally gives notice to Surefil that it must retain and preserve all materials and information that may be relevant to these matters, including, but not limited to, existing Viva products and any raw materials used in the Products, all paper documents and electronic data stored on desktop and laptop computers, e-mails, servers, external hard drives, application files, storage and backup tapes/devices, disk backups (floppy discs, CD's, zip disks, flash drives, optical disks), other storage media devices like PDA's, I-Pod's, Blackberries, USB drives, cameras and cell phones and voice mail systems and answering machines.

The Supply Agreement requires that notices be given to Robert Pero, who Viva understands is no longer associated with Surefil. Please advise as to whom such notice should now be provided other than to Harold E. Nelson, who is copied on this letter.

Please be advised that Viva reserves its right to seek any and all legal remedies, under law or by contract, with respect to any of the matters enumerated in this letter.

Sincerely,

Gary Shiffman
Its: Manager

Cc:    Harold E. Nelson, Nantz, Litowich, Smith, Girard & Hamilton  [Fax: (616) 977-0529]
        Jaffe, Raitt, Heuer & Weiss, P.C.

3

1848932.02